## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA      *

     *

v      *     Criminal Case: ELH-15-0359

EDWARD LEE TUCKER,      *

     *
     ***

## MEMORANDUM OPINION

Defendant Edward Lee Tucker, who is now self-represented, seeks compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  In an Indictment filed on June 23, 2015 (ECF 1), Tucker was charged with multiple offenses:  possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count One); possession with intent to distribute cocaine, under 21 U.S.C. § 841(a)(1) (Count Two); and possession of a firearm in furtherance of a drug trafficking crime, as charged in Count Two, in violation of 18 U.S.C. § 924(c) (Count Three).

Pursuant to a Plea Agreement (ECF 401), defendant entered a plea of guilty to Count Two on April 4, 2016.  ECF 39.  The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a sentence of 132 months of imprisonment.  ECF 40, ¶¶ 10, 11.

Sentencing was held on June 10, 2016.  ECF 46.  According to the Presentence Report ("PSR," ECF 44), the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") called for a sentence ranging from 151 to 188 months of imprisonment.  *Id.* ¶ 90.  However, the Court imposed the agreed upon sentence of 132 months of imprisonment, with credit dating from March 25, 2015.  ECF 47 (Judgment).

The defendant filed correspondence dated May 6, 2020 (ECF 52), docketed on May 15, 2020, which was construed as a motion for compassionate release under 18 U.S.C.

§ 3582(c)(1)(A)(i) ("First Motion").  By Order of September 4, 2020 (ECF 53), the Court denied the First Motion, because the defendant did not indicate whether he exhausted his administrative remedies, as required by 18 U.S.C. § 3582(c)(1)(A), or that 30 days had elapsed since his request to the Warden.

Defendant submitted additional correspondence dated January 25, 2021, docketed on February 5, 2021 (ECF 54, the "Motion").  In the Motion, defendant seeks appointment of counsel "regarding the possible filing for compassionate release, pursuant to the First Step Act of 2018 and 18 U.S.C. Sec. 3582(c)(1)(A)(i) . . . ."  *Id.* at 1.  The Court has construed ECF 54 as a second motion for compassionate release.

On March 12, 2021, the Office of the Federal Public Defender advised the Court that it would not be supplementing defendant's Motion or seeking appointment as counsel for the defendant.  The Court sees no justification for appointment of a lawyer.

By Order of April 13, 2023, the Court directed the government to respond to the Motion. ECF 57.  The government's opposition to the Motion is docketed at ECF 60.  Defendant has not replied.

No hearing is necessary.  For the reasons that follow, I shall deny the Motion, without prejudice.

## I.  Background

As noted, defendant entered a plea of guilty on April 4, 2016, to Count Two of an Indictment (ECF 1) charging possession with intent to distribute cocaine.  *See* ECF 39.  The Plea Agreement (ECF 40) included a stipulation of facts.  *Id.* at 8.  It provided, in part, *id.*:

> On March 20, 2015 The Honorable Judge Weinstein of the District Court of Maryland issued a search and seizure warrant for 601 North Avondale Road in Baltimore County, Maryland.

When the Baltimore County Police Department executed the warrant on March 25, 2015, officers encountered defendant Edward Lee Tucker, a woman and a young child in the home.  Tucker and the woman were advised of their *Miranda* rights.  Both acknowledged that they understood their rights and agreed to speak with police, each advising the officers that there was a small amount of marijuana inside of the house.

During a search of the house, police found and seized a metal box containing 20.64 grams of cocaine, 1.04 grams of marijuana, personal paperwork apparently belonging to Tucker and a Ruger P90 .45 caliber handgun bearing serial number 662047344 with a magazine containing seven .45 caliber rounds of ammunition from the living room; a digital scale from the dining room; and a .13 gram bag of cocaine and glass pipe from a bedroom.

\* \* \*

Tucker gave the officers written consent to search a Honda Accord registered in his name, a vehicle that was suspected by the search warrant affiant to have been used by Tucker to transport CDS.  During a search of the car, officers found a .45 caliber round and a digital scale.

After placing Tucker under arrest, Officers seized from his person two small baggies of cocaine, thirteen pills of Alprazolam, and seventy pills of Oxycodone.

Tucker was interviewed by Baltimore County Police and, after executing a *Miranda* Rights Waiver, acknowledged ownership of the cocaine, marijuana and handgun found in the house.

The defendant admits that he knowingly possessed the cocaine and that he did so with the intent to distribute the cocaine to other persons.  The defendant possessed the firearm in connection to his drug trafficking activities as it was in close enough proximity to the narcotics that it could have easily been used to aid in defending his cocaine from theft and/or destruction by others.

In the Plea Agreement, the parties agreed that, after deductions for acceptance of responsibility under U.S.S.G. § 3E1.1 (ECF 40, ¶ 8), defendant had a final offense level of 29.  *Id.* ¶ 9.  Moreover, they agreed that the defendant qualified as a career offender under U.S.S.G. § 4B1.1, with a criminal history category of VI.  *Id.* ¶ 7.  And, as noted, defendant's Guidelines called for a sentence ranging from 151 to 188 months of imprisonment.  ECF 44, ¶ 90.  But,

pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed that a sentence of 132 months of imprisonment was the appropriate disposition.  ECF 40, ¶¶ 10, 11.

The Presentence Report (ECF 44) reflects that defendant was 34 at the time of sentencing. *Id.* at 3.  He had a high school diploma.  *Id.*

According to the PSR, defendant was arrested twelve times between the ages of 12 and 17. *Id.* ¶¶ 31, 32.  He also had several adult convictions that did not score points.  *Id.* ¶¶ 34, 35, 36, 37, 44.  In addition, defendant had multiple prior offenses that scored points, as reflected in ¶¶ 38, 39, 40, 41, 42, and 43 of the PSR, totaling 14 points.  *Id.* ¶ 45.  In addition, two points were added under U.S.S.G. § 4A1.1(d), because the offense at hand was committed while defendant was on probation.  Sixteen points yields a criminal history category of VI.  *Id.* ¶ 47.[1]  And, as noted, defendant qualified as a career offender, which also results in a criminal history category of VI, under U.S.S.G. § 4B1.1(b).  *Id.* ¶ 48.[2]

With regard to defendant's career offender status, the PSR identified four prior felony drug convictions, all adjudicated in the Circuit Court for Baltimore City.  *Id.*  They are as follows:  drug distribution on July 6, 2004, to which defendant pleaded guilty on March 23, 2005, and received an 18-month sentence.  *See id.* ¶¶ 38, 48; drug distribution on September 16, 2004, for which defendant received a concurrent sentence of 18 months after pleading guilty on March 23, 2005.

---

[1] Based on amendments to the Guidelines that went into effect on November 1, 2023, if defendant were sentenced today, he would receive only one additional criminal history point.  *See* U.S.S.G. § 4A1.1(e).  But, whether defendant had 14, 15, or 16 points, his criminal history category would be VI.

[2] If defendant were not a career offender, his offense level would have been a 14, rather than a 32.  But, with an offense level of 14, he only would have been eligible for two deductions, rather than three deductions under both § 3E1.1(a) and (b) under U.S.S.G. § 3E1.1(a), rather than three deductions under both § 3E1.1(a) and (b).  With a final offense level of 12, and a criminal history category of VI, defendant's Guidelines would have been 30 to 37 months of imprisonment.

*See id.* ¶¶ 39, 48; possession of CDS with intent to distribute, to which defendant pled guilty on September 13, 2007, and received a five-year sentence.  *See id.* ¶¶ 40, 48; drug distribution, to which defendant pled guilty on January 14, 2013, and received a suspended 15-year sentence.  *See id.* ¶¶ 43, 48.  Defendant's other prior offenses included a handgun offense in 2007, for which he received a 5-year sentence.  *Id.* ¶ 41.

In his Motion, defendant claims he has rehabilitated himself.  ECF 54 at 1.  He points to his participation in drug treatment; participation in UNICOR; asserts that he has been incident free for two and a half years; and notes that he is now in a medium security facility.  *Id.* at 2.  Without any specifics, he also asserts that he has "a home plan."  *Id.*  And, he asserts that he has no spleen, has a punctured lung, and previously sustained "gun shot wounds to [the] chest area."  *Id.*

Defendant is now incarcerated at FCI Butner Medium II in North Carolina.  Dating from March 25, 2015, he has served about 8 years and 8 months, or 79% percent of his sentence.  Defendant has a projected release date of April 27, 2025.  *Bureau of Prisons Inmate Locator*, https://www.bop.gov/inmateloc/# (search "Edward Lee Tucker") (last accessed December 1, 2023).

The government opposes the Motion.  ECF 61.  Among other grounds, the government points out that this Court previously denied the First Motion for failure to exhaust.  *See* ECF 52, ECF 53.  Yet, defendant again has failed to establish exhaustion.  ECF 61 at 2-5.

In fairness to the defendant, the Motion has languished, through no fault of the defendant. Therefore, I shall assume, *arguendo*, that exhaustion is not an issue.  And, I will address the merits.

## II.    Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States*

*v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

Section 3582 of Title 18 of the United States Code was first enacted as part of the Sentencing Reform Act of 1984. As originally enacted, it permitted a court to alter a sentence only upon motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief. *See Bethea*, 54 F.4th at 831; *see, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, compassionate release was an infrequent occurrence, because the BOP rarely filed such a motion on an inmate's behalf. *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013). However, as a result of the enactment of the First Step Act ("FSA") in December 2018, a federal inmate could file a motion

6

for compassionate release directly with the court, so long as the inmate first exhausted administrative remedies. *See* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)); *see also United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020).

With the passage of the 2018 FSA, Congress "broadened" the authority of courts to grant sentencing modifications. *Malone*, 57 F.4th at 173. Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes courts to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule that a federal sentence is final. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021). The FSA resulted in a sea change in the law.

In particular, the 2018 FSA authorized a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added). That is, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release. *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.

Nonetheless, there are restrictions. Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831. In other words, the analysis consists of "two steps." *Bond*, 56 F.4th at 383.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief." *Bethea*, 54 F.4th at 831

(citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).  If that criterion is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable."  *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis."  *Jenkins*, 22 F.4th at 169.  However, as the Fourth Circuit has recognized, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement").  Critically, as discussed below, amendments to the Policy Statement took effect on November 1, 2023.  Prior to the amendments, however, the Policy Statement began: "Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ."  U.S.S.G. 1B1.13 (2021).  Interpreting this language in *McCoy*, 981 F.3d at 282, the Fourth Circuit stated that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  Therefore, on the basis of that earlier text, the Court held: "When a defendant exercises his . . . right to move for compassionate release on his own behalf, § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts."  *McCoy*, 781 F.3d at 281.  As a result, district courts were "empowered . . . to

consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

As indicated, the Fourth Circuit based its holding in *McCoy* and other cases on a version of the Policy Statement that has since been amended. *See* Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254 (May 3, 2023) (providing notice of amendments to Congress). In particular, as a result of the amendments that took effect on November 1, 2023, the Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2023) (emphasis added). Thus, the Sentencing Commission has made the Policy Statement expressly applicable to defendant-filed motions under § 3582(c)(1)(A). *Cf. McCoy*, 981 F.3d at 282.

Therefore, it appears that the Fourth Circuit's conclusion in *McCoy*, 981 F.3d at 281, to the effect that "§ 1B1.13 is not an 'applicable' policy statement," is no longer consistent with the Guidelines, as amended. This is because the Policy Statement is now expressly applicable to defendant-filed motions pursuant to 18 U.S.C. § 3582(c)(1)(A).[3]

A court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions. 18 U.S.C. § 3582(c)(1)(A). The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

> (B) In General.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

---

[3] The Court is mindful that defendant filed his Motion long before the amendment to U.S.S.G. § 1B1.13 went into effect on November 1, 2023. But, even if the Court had decided this case prior to the amendment, the outcome would have been the same, as discussed, *infra*.

(1) (A) extraordinary and compelling reasons warrant the reduction; or

(B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

The Policy Statement identifies six circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *Id.* § 1B1.13(b)(1)–(6). These are: certain medical circumstances of the defendant, such as terminal illness or the inability to receive specialized medical care while incarcerated, *id.* § 1B1.13(b)(1); the defendant's age, *id.* § 1B1.13(b)(2); the defendant's family circumstances, *id.* § 1B1.13(b)(3); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction, of a correctional officer, *id.* § 1B1.13(b)(4); the defendant received an "unusually long sentence," *id.* § 1B1.13(b)(6); and "any other circumstances or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." *Id.* § 1B1.13(b)(5).

Prior to the amendments, the district court was obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389, 2396 (2022); *Troy*, 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *United States v. Brice*, 2022 WL 3715086, at *2 (4th Cir. Aug. 29, 2022) (per curiam). Where appropriate, the district court had to "account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 197, 203 (4th

10

Cir. 2023); *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n.3.  However, such developments did not warrant a recalculation of the Guidelines.  *Troy*, 64 F.4th at 184.

Notably, however, § 1B1.13(c) of the Policy Statement now specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement."  Nonetheless, "if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction."  *Id.*

Section 1B1.13(d) of the Policy Statement, which limits the weight a court may assign to a defendant's rehabilitation while serving a sentence, is also relevant.  It provides that, "[p]ursuant to 28 U.S.C. §994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  *Id.*  "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted."  *Id.*

Even if a defendant establishes that extraordinary and compelling reasons warrant relief, the court must also consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Mangarella*, 57 F.4th at 200, 203; *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022)

(per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d at 693–94 (district court must give due consideration to the § 3553(a) factors). Notably, the recent amendments to the Guidelines did not alter this requirement.

The "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)). As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500). And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain. *Bond*, 56 F.4th at 384–85.

"A district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Meza v. United States*, ___ U.S.

___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018).  And, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion.  *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case."  *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).  For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'"  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In providing such an explanation, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling."  *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.  In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case."  *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### III.  COVID-19

### A.

Health officials confirmed the first case of COVID-19 in the United States on January 31, 2020.[4]  *United States v. Pair*, 84 F. 4th 577, 580 (4th Cir. 2023) (citation omitted).  Then, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic.  *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)*, TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P.  That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

COVID-19 is extremely contagious.  *Pair*, 84 F.4th at 589.  And, it spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).  For a significant period, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, 462 F. Supp. 3d 746, 752–53 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).  Schools and businesses were closed, or operated on a limited basis, in an effort to thwart the spread of the virus.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://perma.cc/QGL2-3URS.  As the Fourth Circuit has put it, in the early months of 2020, "a

---

[4] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://perma.cc/24J3-UQZN.

new reality set in.   Nations around the world announced stringent limitations on in-person interaction . . . businesses ground to a halt; and death tolls mounted."   *Pair*, 84 F.4th at 580.

The judges of this Court "have written extensively about the pandemic."   *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.   *Id.*   Nevertheless, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.   *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020), *abrogation on other grounds recognized by United States v. Philliberti*, 557 F. Supp. 3d 456 (S.D.N.Y. 2021) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

People infected with the coronavirus sometimes experience only mild or moderate symptoms.   But, particularly at the outset of the pandemic, the virus caused severe medical problems as well as death, especially for those in "high-risk categories . . . ."   *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).   On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."   Trevor Hunnicutt & Jeff Mason, *Biden Marks One Million U.S. COVID Deaths After Losing Political Battles*, REUTERS (May 12, 2022), https://perma.cc/TLA5-YNFB.   And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19.   *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://perma.cc/J7XS-FYHT.

The Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and has repeatedly revised its guidance concerning medical conditions that pose a greater risk of severe illness due to COVID-19.  The CDC most recently updated its guidance in May 2023 to reflect the most current data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 11, 2023), https://perma.cc/923J-T5P8.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities such as Down syndrome; heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; having a BMI 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person."  *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

The Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive."  *Hargrove*, 30 F.4th at 195.  That is, a court  may not

adopt a rule "that conditions not listed in the CDC's highest category, no matter the conditions of the prison and risk of infection, can never qualify as extraordinary and compelling reasons to reduce a sentence." *Id.* at 195 (internal quotation marks omitted). Nevertheless, the court may consider the CDC's guidelines. *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam). In any event, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from COVID-19." *Bethea*, 54 F.4th at 832.

## B.

As noted, the coronavirus is "highly contagious." *Pair*, 84 F.4th at 589. At the outset of the pandemic, some of the "measures we now know to be useful in combating the spread of the virus (such as masking, separation . . . and vaccinations) were either nascent or, as in the case of vaccines, unavailable." *Id.* Nevertheless, in an effort to prevent the spread of COVID-19, the CDC urged, *inter alia*, the practice of "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://perma.cc/UJ98-2V6S; *see also Pair*, 84 F.4th at 585.

However, social distancing and "rigorous personal hygiene," which are "important combatants to the virus," are particularly difficult in the penal setting. *Seth*, 461 F. Supp. 3d at 248. Indeed, prisoners have little ability to protect themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same

cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020), https://perma.cc/3RHL-WNKU.  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others.  *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe,'* WASH. POST (Aug. 24, 2020), https://perma.cc/K6SW-LFGX (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to limit their spread.  *See Coreas v. Bounds*, TDC-20-0780, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021), https://perma.cc/TR7Q-8H9J ("The cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.  Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519–20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, "in recognition of [the] stark reality" that COVID-19 posed substantial challenges to incarcerated individuals, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 461 F. Supp. 3d at 248. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."

Thereafter, on March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP should prioritize

for review for home confinement eligibility those inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

### C.

There is no cure for the coronavirus.  But, medical therapies have continued to improve, and vaccines are now generally available.  *See Stay Up to Date with COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL & PREVENTION (Oct. 4, 2023), https://perma.cc/VZ77-KN7W.  Although the vaccines do not appear to prevent illness, they do seem to reduce the seriousness of the illness.

On January 4, 2021, at about the time the first vaccines became available, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://perma.cc/P4KL-PEZW.  It provided that administration of the COVID-19 vaccines (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://perma.cc/2FF2-G6PX.

Much has changed since the coronavirus first emerged in early 2020.  And, the virus, too, has changed repeatedly, with multiple strains and variants.  As of May 11, 2023—the last day on which the CDC updated its vaccine tracker—approximately 69% of the total U.S. population had completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up.  *See COVID-19 Vaccinations in the United States*,

CTRS. FOR DISEASE CONTROL, https://perma.cc/B2KG-M4E3 (final update May 11, 2023); *Trends*

*in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*,

CTRS. FOR DISEASE CONTROL, https://perma.cc/6W5Q-55DR (final update May 11, 2023).

### D.

In an interview in September 2022 on the CBS television show "60 Minutes", President

Biden declared that the pandemic was "over" in the United States.  Alexander Tin, *Biden Says*

*Covid-19 Pandemic is "Over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is

over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the

pandemic is over."  *Id*.  And, on April 10, 2023, President Biden signed into law House Joint

Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic."

Pub. L. No. 118-3, 137 Stat. 6 (2023).

Nevertheless, at the time of this writing, data suggests that COVID-19 remains prevalent.

*See COVID Data Tracker*, CNTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 11, 2023),

https://covid.cdc.gov/covid-data-tracker/#datatracker-home.

At FCI Butner Medium II, where defendant is incarcerated, there are 4,057 inmates.  As of

November 27, 2028, 2,698 inmates have been inoculated, there are three open cases of Covid-19,

and 0 deaths.  *See* Federal Bureau of Prisons Inmate COVID-19 Data, November 27, 2028.

### IV. Discussion

The government asserts that defendant's medical records do not reflect treatment for any

serious health ailments, "besides what is described as chest discomfort . . . ."  ECF 61 at 7.

Therefore, the government maintains that defendant has not demonstrated extraordinary and

compelling reasons warranting his release.  However, the government did not provide any medical

records to the Court, contrary to its usual practice.

Notably, the PSR (ECF 44) reports that defendant suffered two gunshot wounds to the chest in 1996. *Id.* ¶ 72. And, he has no spleen. *Id.* Moreover, the defendant advised that he was diagnosed in 2007 with Bipolar Disorder. *Id.* ¶ 74. Beginning at age 11, the defendant consumerd alcohol. *Id.* ¶ 75. By age 13, he began daily use of marijuana. *Id.* ¶ 76. He later used crack cocaine, heroin, and Percocet. *Id.*

The government maintains that "rehabilitation alone is not grounds for a finding of extraordinary and compelling reasons to reduce a sentence." ECF 61 at 5. And, it argues that defendant's disciplinary record "significantly weakens his rehabilitation claims." *Id.*[6]

Further, the government argues that the sentencing factors under 18 U.S.C. § 3553(a) counsel against a sentence reduction. *Id.* at 8. According to the government, the nature and seriousness of the offense do not favor relief, and release would not promote respect for the law. *Id.* In this regard, the government points to defendant's drug related infractions during his incarceration. *Id.*

Section 1B1.13(b)(1) of the recently revised Policy Statement identifies four circumstances under which a defendant's medical condition may provide an extraordinary and compelling reason for relief. *See* U.S.S.G. § 1B1.13(b)(1)(A)–(D). First, under § 1B1.13(b)(1)(A), "a terminal illness (*i.e.,* a serious and advanced illness with an end-of-life trajectory)," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia," may provide an extraordinary and compelling reason for relief. Second, under § 1B1.13(b)(1)(B), an extraordinary or compelling reason may exist if the defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or

---

[6] The government did not include any exhibits concerning defendant's infractions. However, defendant did not dispute the government's assertion.

"experiencing deteriorating physical or mental health because of . . . aging," and such condition or impairment "substantially diminishes" the defendant's ability to care for himself.  Third, under § 1B1.13(b)(1)(C), an extraordinary or compelling reason may exist if "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death."

Finally, under § 1B1.13(b)(1)(D), relief may be warranted if:

(i)    the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

(ii)   due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

(iii)  such risk cannot be adequately mitigated in a timely manner.

Defendant does not assert, nor is there is any evidence to suggest, that he is suffering from a terminal illness, *see id.* § 1B1.13(b)(1)(A), or that his ability to care for himself is "substantially diminishe[d]" by a "serious physical or medical condition," "serious functional or cognitive impairment," or his age.  *Id.* § 1B1.13(b)(1)(B).  And, there is no basis on which to conclude that defendant "is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death."  *Id.* § 1B1.13(b)(1)(C).

In addition, defendant has failed to demonstrate an entitlement to relief under § 1B1.13(b)(1)(D) of the Policy Statement, which provides that, in some circumstances, a greater vulnerability to serious medical complications caused by an infectious disease can provide an extraordinary and compelling reason for a sentence reduction.  Defendant has not shown that he

has any medical condition that places him "at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of" COVID-19.  U.S.S.G. § 1B1.13(b)(1)(D)(ii); *see People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

To be sure, the spleen is important in fighting infection.  Cleveland Clinic, *Spleen: Function, Location & Size, Possible Problems*, https://perma.cc/Y3QY-ZVRR.  And, defendant's spleen was removed years ago.  However, the CDC has not included the absence of a spleen as a risk factor that exacerbates the likelihood of severe illness from COVID-19.  *People with Certain Medical Conditions*, *supra*, https://perma.cc//923J-T5P8.

In sum, defendant seems to claim that the fact of his incarceration provides an extraordinary and compelling reason for relief.  But, he has not provided a basis on which I may conclude that he has any special vulnerability to severe infection from COVID-19.  His assertions do not suffice to show that relief is warranted under the current Policy Statement.

As mentioned, the Court recognizes that defendant filed his Motion well before the Policy Statement was amended on November 1, 2023.  Even under the former standard, however, defendant's allegations do not constitute an extraordinary and compelling reason for relief.[7]

Under the standard that governed before the recent promulgation of the amended Policy Statement, district courts were "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (citation omitted).  One

---

[7] The Court applies the law in effect at the time of its decision, not the law in effect at the time the Motion was filed.  *Cf., Maryland Shall Issue, Inc. v. Governor Wes Moore*, ___ F.4th ___, 2023 WL 8043827 (4th Cir. Nov. 21, 2023) (ruling in accordance with law in effect at the time of the appellate decision, not the law in effect at the time of the district court's decision).

circumstance that the Fourth Circuit recognized as extraordinary and compelling was a defendant's special vulnerability to severe infection by COVID-19.  *See Brown*, 78 F.4th at 128.

In *Brown*, the Court explained:  "To establish that the risk posed by COVID-10 presents an 'extraordinary and compelling reason' for release, a defendant must allege 'that the risk of contracting COVID-19 in a prison is higher than the risk outside the prison and that [his] preexisting medical condition increases [his] risk of experiencing a serious, or even fatal, case of COVID-19.'"  *Id.* (quoting *High*, 997 F.3d at 185).  Although "this inquiry [was] multifaceted and . . . account[ed] for the totality of the relevant circumstances, courts within the Fourth Circuit" regularly considered "whether an inmate shows both a particularized susceptibility to COVID-19 and a particularized risk of contracting the disease at his prison facility."  *Brown*, 78 F.4th at 128 (citations and internal quotation marks omitted).

But, he has not shown that he has a particularized susceptibility to COVID-19.  Indeed, he has not identified any medical conditions recognized by the CDC as placing a person at greater risk of severe infection.  *See People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8. Nor has defendant demonstrated a particularized risk of contracting COVID-19 at FCI Butner, where there are no open cases.  *See Inmate COVID-19 Data*, *supra*, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp#lastestCovidData.

My conclusion that defendant has not identified an extraordinary and compelling reason for relief is, by itself, sufficient grounds to deny the Motion.  However, assuming, *arguendo*, that defendant has identified an extraordinary and compelling reason for relief, I would then be required to consider the factors under 18 U.S.C. § 3553(a), to determine if a sentence reduction is appropriate.  *See*, *e.g.*, *Brown*, 78 F.4th at n.8.  Upon doing so, I conclude that these factors do not support a reduction in defendant's sentence.

I begin with defendant's history and characteristics.  The offense for which defendant is currently incarcerated is his fifth felony drug offense.  ECF 44, ¶ 44.  And, it is particularly troubling that defendant committed the instant offense while on probation.  *Id.* ¶ 46.

To his credit, defendant has completed several educational programs since 2017.  ECF 61 at 5.  Defendant's record of participation in prison education courses is commendable.  But, his record of multiple infractions, as recently as a year ago, is disturbing.

As the government points out, defendant "had more than a dozen sanctioned incidents" between October 2016 and December 2022.  *Id.*  These included possession of homemade intoxicants in October 2016; possession of suboxone, "E2," and tobacco in "a concealed tube hidden in his anus" in March 2017 (*id.* at 5); physical altercations with other inmates in April 2017 and July 2017; possession of drugs in October 2017 and July 2018; possession of weapons in 2019 and December 2022; and failure to obey an order in April 2021.  *Id.* at 5-6.

Given the seriousness of defendant's underlying offense, his history of recidivism, coupled with his poor institutional adjustment, I conclude that a reduction in the defendant's sentence would not promote respect for the law, provide just punishment, deter criminal conduct, or protect the public from future crimes of the defendant.  *See* 18 U.S.C. § 3553(a)(2)(A)–(C).

## V.  Conclusion

For the foregoing reasons, I shall deny the Motion, without prejudice to defendant's right to file another motion, if warranted.

An Order follows, consistent with this Memorandum Opinion.


Date:   December 1, 2023

_____/s/_____
Ellen Lipton Hollander
United States District Judge